IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON,

     Plaintiff,

v.

U.S. DEPARTMENT OF JUSTICE,

     Defendant.

Civil Action No. C09-0642 RSL

## DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)     I am currently the Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD"), formerly at Federal Bureau of Investigation Headquarters ("FBIHQ") in Washington, D.C., and currently relocated to Winchester, Virginia. I have held this position since August 1, 2002. Prior to joining the FBI, from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters. I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2)     In my official capacity as Section Chief of RIDS, I supervise approximately 256 employees who staff a total of ten (10) Units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests

for access to Federal Bureau of Investigation ("FBI") records and information pursuant to the

FOIA; Privacy Act of 1974; Executive Order 12958, as amended; Presidential, Attorney General

and FBI policies and procedures; judicial decisions; and other Presidential and Congressional

directives.  The statements contained in this declaration are based upon my personal knowledge,

upon information provided to me in my official capacity, and upon conclusions and

determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed

by the FBI in responding to requests for information from its files pursuant to the provisions of

the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a.  Specifically, I am

aware of the FBI's response to plaintiff's December 19, 2008 FOIA request, which seeks access to

records pertaining to "any record held by the U.S. Federal Bureau of Investigation describing the

operation and maintenance of the National Crime Information Center ("NCIC") Violent Gang

and Terrorist Organization File ("VGTOF")."

(4)     The purpose of this declaration is to provide the Court and plaintiff with an

overview of the FBI's efforts to respond to plaintiff's December 19, 2008 FOIA request to

FBIHQ, along with an explanation for the timing of the FBI's response to plaintiff's request.

Following receipt of plaintiff's request, the FBI initiated a search which yielded an initial

universe of approximately 2,180 pages of potentially responsive documents; this amount would

have positioned the request in the RIDS "medium queue" as described in further detail, infra.

This initial search result also triggered a fee letter from the FBI to plaintiff, which went

unanswered by plaintiff.  Additional searches conducted by the FBI have yielded an additional

approximately 23,159 pages of potentially responsive documents, as well as approximately 192

-2-

tape recordings of the meetings of the Criminal Justice Information Division Advisory Policy Board, portions of which may be responsive to plaintiff's request.  These additional potentially responsive records have resulted in an aggregate page count of 25,339 (aside from the 192 tape recordings), thereby necessitating the reassignment of plaintiff's request from the "medium queue" to the "large queue" for processing purposes.  As a result, the defendant submits this declaration in support of a stay of proceedings in order to allow it to fully address and process plaintiff's December 19, 2008 FOIA request.

(5)     The FBI anticipates that it will be able to process and produce non-exempt documents on a rolling basis.  Defendant has offered to provide plaintiff a status report on the processing of the FOIA request by December 15, 2009.  Defendant has further stated that rather then waiting until it completes the entire processing, RIDS is willing to make its production on a periodic rolling basis with the first production to take place by December 15, 2009.  Because the FBI is still completing its search, it is not possible to provide an estimate on when the final response will be complete.

(6)     Once all potentially responsive material is assigned for processing, the FBI will review the documents to determine whether they indeed fall within the scope of plaintiff's December 19, 2008 FOIA request.  It is possible that the actual number of responsive pages -- and the total number of pages to be processed -- may be reduced at that time.  As a result, it is possible that the FBI will be able to complete its response more quickly.  The FBI will advise the Court and plaintiff promptly as to any significant changes -- including reductions -- in its current estimates of time required to locate documents potentially responsive to plaintiff's FOIA request.

-3-

## CORRESPONDENCE RELATED TO PLAINTIFF'S
## FOIA/PRIVACY ACT REQUESTS

(7)     Set forth below is a chronology and description of the pertinent correspondence concerning plaintiff's FOIA request. Copies of this correspondence is attached hereto as **Exhibits A - D.**

(8)     By letter dated December 19, 2008 addressed to FBIHQ, plaintiff submitted a FOIA request for "any record held by the U.S. Federal Bureau of Investigation describing the operation and maintenance of the National Crime Information Center ("NCIC") Violent Gang and Terrorist Organization File ("VGTOF")." Plaintiff agreed "to pay search, duplication, and review fees up to $100.00" and requested a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) and (a)(4)(A)(iii) if the fees amount to more than $100.00. **(See Exhibit A.)**

(9)     By letter dated January 6, 2009, the FBI advised plaintiff that it was searching the indices to the Central Records System at the FBI's Headquarters for responsive records, and that the request was assigned Request Number 1124788. **(See Exhibit B.)**

(10)     By letter dated January 9, 2009, the FBI advised plaintiff's counsel Michael J. Wishnie, via first class postage pre-paid mail, that it had located approximately 2,180 pages of potentially responsive material to the December 19, 2008 FOIA request, estimated duplication costs of $208, and asked plaintiff to indicate whether it was interested in discussing the possibility of reducing the scope of the request or whether it was willing to pay additional fees.[1] **(See Exhibit C.)** The letter requested that plaintiff's counsel provide a response in writing that

---

[1] As the FBI did not receive a response to its January 9th letter to plaintiff, RIDS did not move forward to complete its search for additional documents or to complete its review and processing of the 2,180 pages described in its letter dated January 9, 2009.

could be faxed to the FBI's Records Management Division.  The letter also requested that

plaintiff's counsel provide a telephone number so that the FBI could contact plaintiff to discuss

the request.

(11)     By letter dated November 17, 2009, the FBI advised plaintiff that the request for a

fee waiver had been denied as plaintiff provided no specific details to support a fee waiver

request and failed to meet the factors for the granting of a fee waiver.  **(See Exhibit D.)**

(12)     On May 8, 2009, plaintiff filed a Complaint in the U.S. District Court for the

Western District of Washington at Seattle requesting release of all records responsive to its

December 19, 2008 FOIA request.

### SEARCH FOR RECORDS RESPONSIVE TO PLAINTIFF'S REQUESTS

(13)     One of the difficulties in identifying records responsive to plaintiff's December

19, 2008 request has been the broad nature of the subject matter, i.e.,

> •       Any and all portions of the NCIC 2000 Operating Manual (Dec.
> 1999 ed.), any subsequent editions of the NCIC 2000 Operating Manual, and any
> updates, revisions, or supplements to the Manual, relating to the VGTOF;

> •       Any records containing information illuminating or describing the
> organization, structure, operation, maintenance, or use of the VGTOF;

> •       Any and all manuals, policy memoranda, or other guidance
> describing the criteria for entry into and removal from the VGTOF, or describing
> the criteria for any updates, changes, revisions, or supplements to an entry or
> record in the VGTOF;

> •       Any and all manuals, policy memoranda, or other guidance
> describing the criteria for entry into and removal from any sub-portion or sub-part
> of the VGTOF, or describing the criteria for any updates, changes, revisions, or
> supplements to an entry or record in a sub-portion or sub-part of the VGTOF;

> •       Any and all manuals, memoranda or other guidance describing any
> statuses, designations, abbreviations, numeric or alpha-numeric codes, or terms of
> art used in the entries or records contained or referenced in the VGTOF, or
> describing the criteria for assignment or use of such statuses, designations,

abbreviations, numeric or alpha-numeric codes, or terms of art;

•        Any and all manuals, memoranda, or other guidance detailing the consequences of being listed in the VGTOF;

•        Any records from the FBI Criminal Justice Information Services Division, Advisory Policy Board ("APB"), relating to the VGTOF, including but not limited to agenda for ABP meetings, minutes of APB meetings, or hand-outs or other records prepared for or distributed at APB meetings;

•        Any records containing information on aggregate numbers pertaining to entries or records in the VGTOF, including but not limited to: the total number of entries or records in the VGTOF; the total number of individuals who are the subject of entries or records in the VGTOF; the number of entries or records (or number of individuals who are the subject of entries or records) in sub-parts or sub-portions of the VGTOF; the number of entries or records (or number of individuals who are the subject of entries or records) in the VGTOF assigned a particular status, designation, abbreviation, numeric or alpha-numeric code; the number of terrorism-related entries or records (or number of individuals who are the subject of terrorism-related entries or records) in the VGTOF or in any sub-parts or sub-portions of the VGTOF; and the number of gang-related entries or records (or number of individuals who are the subject of gang-related entries or records) in the VGTOF or in any sub-parts or sub-portions of the VGTOF;

•        Any records containing information on the numbers or percentages of individuals of any given race, gender, age, national origin or religious background who are the subject of entries or records in the VGTOF or in sub-parts or sub-portions of the VGTOF; and

•        Any records containing information about the aggregate numbers reflecting the length of time entries or records are maintained in the VGTOF or any sub-part or sub-portion of the VGTOF, including but not limited to: the average length of time an entry or record is maintained; the maximum length of time an entry or record is or can be maintained; the minimum length of time an entry or record is or can be maintained; and whether there have been any trends or variations (since the creation of VGTOF) with regard to the average length of time an entry or record is maintained.

(14)        Initially, RIDS performed a search of its Request Tracking System ("RTS") to

determine if similar requests for the NCIC Operating Manual had ever been received.  RIDS

determined that this Manual had been processed and released in 2001.  Therefore, RIDS

contacted the appropriate Unit within the FBI to determine if this version of the NCIC Operating

Manual was current or if there were any Technical Operating Updates ("TOU"). RIDS located 1,245 pages of TOUs to the NCIC 2000 Operating Manual (Dec. 1999 ed.). Therefore, RIDS initially located a total of 2,180 pages of potentially responsive material to plaintiff's December 19, 2008 FOIA request.

(15)     The potentially responsive documents were scanned into electronic format and forwarded to the "perfected case" backlog. Based on the page count of 2,180 pages, plaintiff was contacted (See Exhibit D) in an attempt to narrow the scope of the request and facilitate a more rapid response. However, plaintiff did not respond to the FBI's letter to either narrow its FOIA request or indicate its willingness to pay any fees above $100.00.

(16)     RIDS in an effort to resolve the matter (without waiving its defenses or its right to fees) initiated a further search for other potentially responsive documents. RMD, in coordination with the Office of the General Counsel ("OGC"), sent an Electronic Communication ("EC") to those FBI offices most likely to maintain records responsive to the request in order to determine what, if any, potentially responsive records they possessed to plaintiff's December 19, 2008 FOIA request. Several offices have located potentially responsive records and those records have been forwarded to RIDS but the search for further records continues in order to identify all potentially responsive documents. Thus far, in addition to the initial 2,180 pages, an additional 23,159 pages of potentially responsive documents have been located to date along with potentially responsive tape recordings.

## **HOW A FOIA REQUEST IS PROCESSED IN RIDS**

(17)     Over the years, FOIA management at FBIHQ has continuously re-engineered the process of responding to FOIA/Privacy Act requests in an effort to better serve the needs of

requesters who seek information from the FBI. In 2002, reorganization of various divisions at

FBIHQ resulted in the formation of the RMD, which now handles all FOIA/Privacy Act requests

through the RIDS. These most recent re-engineering efforts have resulted in a new

organizational plan which will be discussed in more detail below.

(18)    The mission of RIDS is to effectively plan, develop, direct, and manage responses

to requests for access to FBI records and information. RIDS provides program and policy

management that pertains to the research, review, analysis, processing, and

classification/declassification work related to the FOIA and Privacy Act; Executive Order 12958,

as amended; Presidential, Attorney General, and FBI policies and procedures; judicial decisions;

and Presidential and Congressional directives. RIDS also provides prepublication review of

material written by current and/or former FBI employees concerning FBI matters as mandated by

the FBI's employment agreement, executes the FBI's historic declassification program, and

assists in managing defense discovery efforts in large counterterrorism criminal trials. RIDS

currently employs approximately 256 personnel, most of whom are Legal Administrative

Specialists ("LASs"), and who are assigned among the 12 units within RIDS. RIDS employees

intake, review, process, and release information in response to FOIA and Privacy Act requests.

To accomplish this mission, RIDS consists of the following 12 Units: one Service Request Unit

("SRU"), two Work Process Units ("WPU"), three Classification Units ("CU"), five FOIPA Units

("FOIPA Disclosure Units"),[2] and the Litigation Support Unit ("LSU").

---

[2] Two of the five FOIPA Disclosure Units operate at off-site locations in Savannah, Georgia and Butte, Montana.

(a)   <u>Service Request Unit</u>:  the Service Request Unit ("SRU") includes the Negotiation Team, which works with individuals whose requests generate a large volume of records in an attempt to narrow the scope of responsive records and facilitate a more rapid response.  Since 1995, this team has eliminated over 13 million pages from FOIA/Privacy Act requests.  The Unit also has a RIDS Public Information Official, who is responsible for assisting requesters with issues concerning their request.  The Government Response Team ("GRT"), also a part of SRU, provides timely feedback to other federal agencies and other DOJ components with regard to referrals of documents which are either FBI-originated or contain FBI-originated information.[3]  Referred documents are sent to the FBI for consultation or for direct response to the requester.  Finally, SRU handles administrative appeals.

(b)   <u>Work Process Units</u>

(i)   The two Work Process Units ("WPUs") are responsible for reviewing and sorting all correspondence/incoming requests for information from the public, Congress, Presidential Libraries, foreign governments, other federal and state agencies, and other FBI entities (<u>i.e.</u>, FBI field offices, Legats).  The WPUs handle various initial tasks required to "perfect" a FOIA/Privacy Act request, including sending letters to acknowledge requests, advising a requester to provide identifying data so that an accurate records search can be made and/or to submit a notarized signature/Privacy Act waiver, and advising a requester when no responsive records are located.  The WPUs also open new requests, assign a FOIA/Privacy Act

---

[3]  The Government Response Team ("GRT") was formerly known as the "Government Response and Prepublication Review Unit."  However, an internal reorganization resulted in shifting the GRT and its functions to the SRU, and shifting the Prepublication Review Team to the RIDS front office.

("FOIPA") Request Number, and enter the perfected requests into the FDPS tracking system. The WPUs are responsible for preparing "perfected" requests for transfer to the five FOIPA Disclosure Units. As previously explained, a request is considered "perfected" when all administrative tasks have been completed and all responsive documents have been scanned into FDPS. Once a request has been perfected, it is placed in the backlog for assignment to a FOIPA Disclosure Unit for processing. The WPUs conduct searches of the general indices for identifiable records, confirm responsive documents, stamp files for retention, address fee issues (other than fee waiver reviews), retrieve and forward files for scanning into FDPS, respond to status inquiries, and maintain requests prior to their transfer to the FOIPA Disclosure Units.

(ii)     After the WPUs perfect a request, it is sent to the "perfected backlog." To ensure fairness to all requesters and to equitably administer the deluge of FOIA/Privacy Act requests received by the FBI, a request is assigned based on the date of receipt on a "first-in, first-out" basis from within each of three queues according to sound administrative practices.[4] The FBI uses a three-queue system as a way to fairly assign and process new requests.[5] The three-queue system established "multi-track" processing for requests, based on the amount of time and work involved in handling a particular request.[6] The system nevertheless preserves the principle that, within the three queues, requests are still assigned and processed on a first-in/first-out basis. The placement of a request in one of the three queues depends on the

---

[4] See 28 C.F.R. § 16.5(a).

[5] This system went into effect on July 10, 1997, superseding the previous system of two queues (one for 100 pages or less, the other for requests greater than 100 pages).

[6] See 5 U.S.C. § 552(a)(6)(D)(I) and 28 C.F.R. § 16.5(b).

total amount of material responsive to that request - 500 pages or less ("small queue"), 501 to

2,500 pages ("medium queue"), or more than 2,500 pages ("large queue").  This standard

operating procedure, coupled with the FBI's "first-in, first-out" policy, permits requests to be

addressed in the order in which they are received, while obviating the inequities to other

requesters whose interests relate only to a small number of documents.  As described earlier,

individuals whose requests have been placed in the large queue are given the opportunity,

through contact with SRU's Negotiation Team, to reduce the scope of their requests and

accelerate assignment of their requests by relocating them to a more advantageous queue.

   (c) <u>Classification Units</u>:  The three Classification Units ("CUs") are responsible

for complying with the classification/declassification review of FBI records under Executive

Order 12958, as amended, and for conducting mandatory declassification review consistent with

Executive Order 12958, as amended.  The CUs review documents responsive to FOIA/Privacy

Act requests, criminal and civil discovery requests, Congressional and Presidential mandates,

Presidential Library requests, mandatory declassification requests, Office of Inspector General

Reports, and other federal agency requests in order to determine whether such material should

remain classified or be declassified.  In addition, the CUs review and prepare classified material

for review by the Department of Justice Review Committee ("DRC").[7]

   (d) <u>FOIPA Disclosure Units</u>:  The five FOIPA Disclosure Units perform the

actual processing of records pursuant to the provisions of the FOIA and Privacy Act.

"Processing" involves a page-by-page, line-by-line review of the responsive documents to

---

  [7] The DRC is the FBI's appellate authority with regard to the implementation and
administration  of Executive Order 12958, as amended, and related directives and guidelines
concerning classified information.  <u>See</u> 28 C.F.R. § 17.14.

determine which, if any, FOIA and/or Privacy Act exemptions may apply. This includes redaction of the exempt material and notation of the applicable exemption(s) in the margin of each page and/or preparation of deleted page information sheets when pages are withheld in their entirety, which is now done electronically in FDPS. During the course of their review, the FOIPA Disclosure Units consult with other government agencies, as necessary, for their determination as to the releasability of the other agency's information contained within FBI records, or refer non-FBI documents to those originating agencies for processing and direct response to the requester. The FOIPA Disclosure Units ensure that FOIA and/or Privacy Act exemptions have been applied properly, no releasable material has been withheld, no material meriting protection has been released, all necessary classification reviews have been completed by transferring applicable cases to the CUs, and other government agency information and/or entire documents originating with other government agencies have been properly handled.

(e)   Litigation Support Unit: The Litigation Support Unit ("LSU") is responsible for providing legal support and administrative assistance to the FBI's Office of the General Counsel and Chief Division Counsels and Associate Division Counsels in the FBI's field offices, in all FOIA/Privacy Act requests that result in federal litigation. The LSU coordinates the progress of the FBI's response to a particular FOIA/Privacy Act request as it progresses through the units described above, the receipt of substantive litigation-related information from involved FBI Special Agents ("SAs") in the field offices and operational Divisions at FBIHQ, and the referral of documents to other DOJ components and/or government agencies. The LSU prepares the administrative record, drafts both procedural and substantive declarations, codes documents

-12-

processed by the FOIPA Disclosure Units,[8] and drafts detailed declarations justifying the

assertion of all applicable FOIA/Privacy Act exemptions.

(19)    To promote administrative efficiency, LASs in RIDS work on more than one

request at a time. Certain cases may require that the usual processing be halted midstream. This

can occur for a variety of reasons, including the resolution of classification issues, the location of

additional records, or consultation with other government agencies as to the nature and propriety

of releasing certain information. In the interest of efficiency during this waiting period, the LAS

may fully process other requests. Large requests are often processed on parallel tracks with

smaller requests in an attempt to ensure that one requester does not consume a disproportionate

share of RIDS resources.

(20)    Consistent with standard administrative procedure, any records referred to the FBI

from other DOJ components or other government agencies in response to a particular request are

added to that pending FOIA/Privacy Act request. This process is an equitable way for RIDS to

maintain administrative control of FOIA/Privacy Act requests. Under this system, the same LAS

assigned to process a particular request will also handle the review of records referred by other

DOJ components or government agencies. By ensuring continuity in the processing of FOIA

_____

[8] A coded format is used in cases to assist the Court and parties in reviewing information
which the FBI withholds within the context of processed documents. Each instance of
information withheld pursuant to the FOIA is accompanied by a coded designation that
corresponds to specified categories. For example, if "(b)(7)(C)-1" appears on a document, the
"(b)(7)(C)" designation refers to Exemption (b)(7)(C) of the FOIA, which concerns
"Unwarranted Invasion of Privacy." The numerical designation "-1" following the "(b)(7)(C)"
narrows the main category to the more specific subcategory of "Names and/or Identifying Data of
Third Parties Merely Mentioned." Although adding codes is a time-consuming process, it helps
the Court and the parties in those jurisdictions that accept coded declarations to explain more
clearly the nature of the withheld material.

requests, this system is not only fair to all persons seeking information under the FOIA, but is also administratively efficient.

## HISTORICAL OVERVIEW OF THE FBI'S FOIA/PRIVACY ACT BACKLOG

(21)     By way of historical background, the number of FOIA and Privacy Act requests received by the FBI increased dramatically during the early 1980s.  The Freedom of Information and Privacy Acts ("FOIPA") Section [the predecessor to RIDS] began processing requests in 1975.  Initially overwhelmed by the number of requests, by 1981 the FBI had achieved a steady backlog between 4,000-7,000 requests.  Beginning in 1985, the unavailability of additional employees and a steady, large stream of new requests increased the backlog substantially until in 1996 there were in excess of 16,000 requests.  In 1996, the median time for a pending request was in excess of three years.

(22)     During the years that the backlog continued to grow, the FBI repeatedly sought additional funding for the creation of new FOIA/Privacy Act positions.  For example, Congress appropriated funds in the 1997 fiscal year budget providing for 129 additional employees, and in the 1998 fiscal year budget provided for 239 additional employees.  In 2002, RIDS moved to paperless processing through FDPS.  The FDPS allows the user to scan FBI files, documents, and correspondence, and enables the user to process pages electronically rather than manually.  RIDS is now using this system to process virtually all of its FOIA/Privacy Act requests.  The new process has required the FBI to redistribute some of its FOIPA personnel to other sections within RMD in order to support the scanning and archival services necessary for automated processing.  Despite an additional reduction of RIDS personnel to support the war on terrorism following September 11, 2001, the new efficiencies allowed the FBI to make great strides in reducing

-14-

further its FOIA/Privacy Act backlog. For example, requests at RIDS in various stages of processing between December 31, 1996 and December 31, 2006, dropped from 16,244 to 1,672, resulting in a reduction of 14,572 requests. The median time for a pending request dropped from 1,160 days on December 31, 1996, to 156 days on December 31, 2006.

(23)    During 2006, there was an increase in requests, up from an average of 911 per month in 2005 to an average of 1,277 per month. Despite this increase, the FBI met or surpassed its primary goal of reducing the time required to process requests. The median time for processing small queue requests (less than 500 pages) decreased by 10% and the median time for processing medium queue requests (501 pages-2500 pages) decreased by 16%. However, the median time for the processing of large queue requests (over 2500 pages) increased by 22%. This increase was due to a concerted effort to reduce the backlog of the older, larger cases. This effort resulted in the number of pending large queue requests decreasing from 122 to 51.

(24)    During 2007 to 2008, the FBI continued towards its primary goal of reducing the time required to process requests. In 2009, the dynamics of processing requests changed substantially. On March 19, 2009 the Attorney General provided new guidelines for processing FOIA requests. Included in the guidelines was direction for agencies to streamline the process for requesters. In consultation with DOJ, the FBI determined that it should no longer adhere to the requirements set forth in 28 C.F.R. Sections 16.3(a) & 16.41(a), the "field office rule" in order to comply with the new guidelines. Subsequent to March 19, 2009, a request to any FBI office for records will result in a search and processing of all FBI records no matter where they are located. In addition, the FBI has conducted new searches for every request that was pending on the effective date. This new policy has had an immediate impact on the number of pages

-15-

required to be processed by the FBI. The number of responsive requests rose 20 percent. The size of each request increased by 30 percent. By August 2009 the increase in the number of pending pages exceeded the total number of pages processed in 2008.

(25)     The FBI immediately responded to the dramatic increase of new work. In September 2009 the FBI converted 33 employees at two operational service centers to perform FOIA redaction reviews. In addition, in October 2009, the FBI hired 30 contractor employees to perform WPU functions, thereby freeing additional FBI LASs to perform FOIA review and processing work. Both contractors and FBI employees are currently undergoing training. By March 2010, the FBI anticipates that these individuals will have sufficient training and experience to assist in reducing the pending backlog at the FBI.

(26)     RIDS has taken all possible steps - using available technologies - to aid in the streamlining and reduction of the FOIA/Privacy Act backlog. These include the use of direct on-line computer searches to locate responsive records, the use of forms which eliminate delays associated with word processing, the formation of specific teams to target backlog issues, the development of alternative methods to handle consultations with other government agencies, and the formation of the RIDS FOIPA Litigation Support Unit ("LSU"), which handles all FOIA/Privacy Act litigation. RIDS has a FOIPA Process Board and an Information Technology Change Management Board to improve existing processes, including the use of information technology enhancements to the existing automated processing system. These boards provide a systematic methodology to implement continuous process improvement for the future.

(27)     Currently, the FBI is taking two steps to update its technology and facilities that will in the future reduce dramatically the amount of time it takes the FBI to respond to FOIA and

Privacy Act requests: (a) development of the electronic investigative case file (the "Sentinel Project"); and (b) establishment of an FBI Central Records Complex ("CRC"). The Sentinel Project is an on-going, multi-year project that will result in the elimination of paper investigative case files. With an embedded Records Management Application ("RMA"), FBI employees will be able to search for and retrieve these records electronically. Concurrently, the FBI has begun the process of designing and building a new, state-of-the art CRC in Frederick County, Virginia. This initiative will consolidate all closed FBI paper records from more than 265 different storage locations to one central site. When requested, paper records will be scanned and forwarded electronically. These initiatives will significantly improve RIDS's search and record retrieval capabilities by increasing search accuracy, by decreasing search time, by reducing lost files and missing serials, and by eliminating the manual movement of files. RIDS expects these initiatives, after they are fully implemented, to reduce by 40% the time required to process a FOIA/Privacy Act request. In the meantime, RIDS has moved to an interim facility in Frederick County, Virginia, to recruit and train new employees in anticipation of the construction of the CRC. While this move is essential to future FBI FOIA/Privacy Act operations, it has created significant strains on the FBI's FOIA/Privacy Act resources.

## SPECIFIC STRAINS ON RIDS RESOURCES

(28)   Three significant factors have further impacted the FBI's ability to process recently located records: (a) the physical relocation of the Section's personnel and resources from FBIHQ to the interim facility in Frederick County, Virginia, which has had a significant impact on the section; (b) numerous competing litigation deadlines; and (c) addressing an increase in new requests and a backlog of administrative appeals.

-17-

## Winchester, Virginia Relocation

(29)    RIDS began relocation of its operations from FBIHQ to Winchester, Virginia in

February 2006 by establishing an advance team to prepare for the eventual relocation of RIDS in

incremental stages.  Beginning in the summer of 2006, RIDS began relocating its functions to the

interim facility ("ICRC").  This transition continued until October of 2008, when all units

completed their relocation to Frederick County, Virginia.  As a direct result of this relocation,

numerous seasoned RIDS employees chose to retire or find other employment rather than

relocate to Winchester.  Only 76 out of 211 employees who had worked at FBIHQ now remain

with the section.  Over 60 percent of the section has less than five years experience.  As a result

of  the FBI's aggressive and intensive recruitment and hiring effort in the Frederick County,

Virginia area, RIDS has been able to bring on-board 161 new employees, 54 of whom have less

than one year of experience with FOIA.

(30)    The new RIDS employees who have less than one year of experience are in

various stages of professional development, but none are yet operating as experienced

employees.  It takes an average of three years to adequately train a new employee in the

FOIA/Privacy Act process to be able to work independently in a productive, efficient, and

effective manner.  Accordingly, RIDS has only a limited number of experienced employees

processing FOIA/Privacy Act requests at this time.

## Pending FOIA Litigations

(31)    Simultaneously with the resource drain caused by RIDS' relocation to Winchester,

Virginia, the FBI has been faced with a significant FOIA litigation workload.  Several pending

litigations are document-intensive and have required the devotion of significant resources in

-18-

order to comply with agreed-upon litigation deadlines.

(32)     For example, in <u>Rosenfeld v. U.S. Department of Justice and U.S. Federal Bureau</u> <u>of Investigation</u>, Civ. A. No. 07-3240-MHP, (N.D. Cal.), the FBI has just completed the re-processing of approximately 8,000 pages and is awaiting response from plaintiff regarding this material. In addition, the FBI is currently reprocessing several large cross-references and searching for additional records. In order to comply with these demands, several components of RIDS have realigned its personnel resources and have made a substantial commitment of resources to address these issues.

(33)     In <u>ACLU v. Department of Defense, et al.,</u> Civ A. No. 08-1003 (D.D.C.), the FBI, in an agreement reached with ACLU, has agreed to produce all FBI documents provided to the Inspector General's Office ("IG") that were used in the IG report referencing the treatment of foreign detainees. In this case, the FBI has scanned approximately 14,300 pages of responsive documents into FDPS and the FBI is currently making monthly releases to the plaintiff. The FBI reasonably anticipates that RIDS employee resources will once again be strained to meet this agreement.

(34)     In <u>New York Civil Liberties Union v. United States Department of Justice,</u> Civ. A. No. 08-CV-5674 (S.D.N.Y.), the FBI has agreed to review an additional approximately 51,000 pages of interviews in order to produce a sample of 200 interviews. These pages were spread across the country and located in each of the FBI's 56 field offices. These pages are to be processed and released by November 27, 2009. To meet this commitment, RIDS once again shifted its already strained employee resources.

(35)    In <u>Kisseloff v. Federal Bureau of Investigation, et al.</u>, Civ. A. No. 08-cv-391

(D.D.C.), the FBI is working to reach an agreement with plaintiff to produce the documents

originally requested by the plaintiff.  The FBI has offered to produce approximately 48,200 pages

of responsive material.  As of this date, the FBI is waiting for a response to this counter-offer.

This number could increase if this offer is not accepted by the plaintiff.  The FBI reasonably

anticipates that RIDS employee resources will once again be strained to meet this agreement.

(36)    In <u>Forensic Justice Project, et al. v. Federal Bureau of Investigation, et al.</u>, 06-CV-

1001 (D.D.C.), the FBI has located and scanned in approximately 206,452 pages of responsive

documents.  As of October 22, 2009, the FBI has released approximately 62,185 pages to

plaintiff, consistent with the agreement reached between the parties in this pending litigation.

Currently, 31 Disclosure Unit LASs are processing and releasing documents in this case on a

rolling basis.  RIDS' employee resources will continue to be diverted in order to comply with the

schedule agreed upon between the plaintiff and the FBI in this case.

## **Pending Requests and Administrative Appeals**

(37)    In addition to the numerous pending litigations, the same RIDS personnel who are

addressing litigation deadlines have also had to address a high volume of requests and

administrative appeals.  Over the past seven years, the FBI has received, on average, 1,043

FOIA/Privacy Act requests per month, which is an average of 12,516 requests annually.  In FY

2009, the FBI received, on average, 1,126 requests per month, which is an average of 13,511

FOIA/Privacy Act requests annually.  There are approximately 1,207,767 pages of responsive

documents currently being processed by the FOIPA Disclosure Units and an additional

approximately 714,307 pages of responsive documents in the "perfected" backlog awaiting

-20-

assignment to a FOIPA Disclosure Unit for processing. Currently, the median number of days for pending requests in the "small queue" is 131 days, 215 days for "medium queue" requests, and 347 days for "large queue" requests. Due to the increased numbers of requests, as well as the volume and complexity of the records, as of this date there are approximately 1,140 requests, representing 1,207,767 pages, being processed at the same time as plaintiff's request. Several of these pending FOIA requests pre-date plaintiff's request.

(38)    RIDS personnel also work closely with the staff of the U.S. Department of Justice, Office of Information Policy ("OIP") to review and assist with OIP's responses and determinations regarding pending administrative appeals. As of October 31, 2009, the FBI and OIP had managed to reduce the backlog of pending administrative appeals to 149. While this number represents a significant decrease, it has required a diversion of personnel resources and has been achieved at the expense of an additional drain on the FBI's FOIA resources. Inevitably, the time spent by RIDS personnel assisting OIP in addressing these administrative appeals reduces the amount of time that they are able to devote for regular processing duties related to litigation as well as other pending FOIA/Privacy Act requests.

## PROPOSED SCHEDULE

(39)    The total estimated page count as of this date is approximately 25,339 pages. That number may increase as the FBI continues its search. The ultimate number of responsive pages, however, may be less once RIDS completes a scoping review and eliminates non-responsive pages. As of this date, I am advised that a portion of the documents identified to date have been scanned in to FDPS and they have been assigned to LASs to begin scoping, review and processing.

-21-

(40)    Once all of the potentially responsive records to plaintiff's FOIA request are identified, the records will then need to be reviewed to determine whether they are in fact responsive to the request. To the extent the records are found to be responsive, RIDS must then conduct a page-by-page, line-by-line review of the responsive documents to determine which, if any, of the FOIA exemptions may apply. This includes redaction of the exempt material and notation of the applicable exemption in the margin of each page or preparation of page information sheets when pages are withheld in their entireties. If any of the documents contain information from other government agencies or components of the DOJ, RIDS will either refer those documents to the other agencies or consult with those agencies as to the releasability of the information. Further, if any of the documents are classified, the documents must be reviewed by one of the three Classification Units.

(41)    Due to the anticipated volume and complexity of the material in this case, defendant has offered to release documents on a rolling basis to plaintiff. Defendant proposed its first production to take place on December 15, 2009. As the processing of a significant number of documents is completed, the FBI will make releases until the production is complete, rather than delay the release until the entire production is ready.

(42)    The FBI takes its responsibilities with regard to the administration of the FOIA/Privacy Act program very seriously and all reasonable efforts are being made to comply with the statutory deadlines. Regrettably, compliance with these deadlines is often not possible. However, as explained supra, the FBI has made tremendous strides in reducing its backlog over time. A reduction in pending requests has occurred even while the FBI continues to receive hundreds of new FOIA/Privacy Act requests. Nevertheless, the most equitable way to reduce the

backlog and ensure that each request receives the attention it deserves is to process these requests based on the date of receipt according to sound administrative practices as explained above. Each court order directing one request be given priority ahead of the others invariably works to the detriment of the other, more patient, requesters and encourages these requesters to seek relief in the courts, thereby undermining the FBI's attempt to manage the thousands of FOIA/Privacy Act requests it receives annually in a fair and consistent fashion.

## CONCLUSION

(43)     To date, the FBI has identified approximately 25,339 pages and approximately 192 tape recordings which are potentially responsive to plaintiff's request. The FBI's search for responsive documents is on-going. The FBI is prepared to begin releasing documents on a rolling basis to plaintiff. Until the FBI completes that search and knows the total volume and nature of any additional responsive documents, it cannot provide an estimate of when it will be able to complete it final processing. The FBI is prepared to make interim releases on a periodic rolling basis with the first production to take place by December 15, 2009, and is willing to provide the Court and plaintiff with periodic status reports on the progress of its efforts to complete its response to plaintiff's FOIA request.

-23-

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct, and that Exhibits A through D attached hereto are true and correct copies.

Executed this 23ᵈ day of November, 2009.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Winchester, Virginia

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

AMERICAN CIVIL LIBERTIES UNION )
OF WASHINGTON, )
                                             )
      Plaintiff, )
                                             )
          v. )         Civil Action No. C09-0642 RSL
                                           )
U.S. DEPARTMENT OF JUSTICE, )
                                           )
      Defendant. )

# EXHIBIT A



# Allard K. Lowenstein
# International Human Rights Clinic

December 19, 2008

Federal Bureau of Investigation
Record Information/Dissemination Section
170 Marcel Drive
Winchester, VA 22602-4843

**Re: Freedom of Information Act Request**

Dear FOIA Officer:

This letter is filed on behalf of the Allard K. Lowenstein International Human Rights Clinic at Yale Law School, the Immigrants' Rights Project of the American Civil Liberties Union, and the American Civil Liberties Union of Washington. Pursuant to the federal Freedom of Information Act, 5 U.S.C. § 552 we request access to and copies of any record held by the U.S. Federal Bureau of Investigation describing the operation and maintenance of the National Crime Information Center ("NCIC") Violent Gang and Terrorist Organization File ("VGTOF"), including but not limited to:

- Any and all portions of the NCIC 2000 Operating Manual (Dec. 1999 ed.), any subsequent editions of the NCIC 2000 Operating Manual, and any updates, revisions, or supplements to the Manual, relating to the VGTOF.
- Any records containing information illuminating or describing the organization, structure, operation, maintenance, or use of the VGTOF.
- Any and all manuals, policy memoranda, or other guidance describing the criteria for entry into and removal from the VGTOF, or describing the criteria for any updates, changes, revisions, or supplements to an entry or record in the VGTOF.
- Any and all manuals, policy memoranda, or other guidance describing the criteria for entry into and removal from any sub-portion or sub-part of the VGTOF, or describing the criteria for any updates, changes, revisions, or supplements to an entry or record in a sub-portion or sub-part of the VGTOF.
- Any and all manuals, memoranda or other guidance describing any statuses, designations, abbreviations, numeric or alpha-numeric codes, or terms of art used in the entries or records contained or referenced in the VGTOF, or describing the criteria for assignment or use of such statuses, designations, abbreviations, numeric or alpha-numeric codes, or terms of art.
- Any and all manuals, memoranda, or other guidance detailing the consequences of being listed in the VGTOF.

- Any records from the FBI Criminal Justice Information Services Division, Advisory Policy Board ("APB"), relating to the VGTOF, including but not limited to agenda for ABP meetings, minutes of APB meetings, or hand-outs or other records prepared for or distributed at APB meetings.
- Any records containing information on aggregate numbers pertaining to entries or records in the VGTOF, including but not limited to: the total number of entries or records in the VGTOF; the total number of individuals who are the subject of entries or records in the VGTOF; the number of entries or records (or number of individuals who are the subject of entries or records) in sub-parts or sub-portions of the VGTOF; the number of entries or records (or number of individuals who are the subject of entries or records) in the VGTOF assigned a particular status, designation, abbreviation, numeric or alpha-numeric code; the number of terrorism-related entries or records (or number of individuals who are the subject of terrorism-related entries or records) in the VGTOF or in any sub-parts or sub-portions of the VGTOF; and the number of gang-related entries or records (or number of individuals who are the subject of gang-related entries or records) in the VGTOF or in any sub-parts or sub-portions of the VGTOF.
- Any records containing information on the numbers or percentages of individuals of any given race, gender, age, national origin or religious background who are the subject of entries or records in the VGTOF or in sub-parts or sub-portions of the VGTOF.
- Any records containing information about the aggregate numbers reflecting the length of time entries or records are maintained in the VGTOF or any sub-part or sub-portion of the VGTOF, including but not limited to: the average length of time an entry or record is maintained; the maximum length of time an entry or record is or can be maintained; the minimum length of time an entry or record is or can be maintained; and whether there have been any trends or variations (since the creation of VGTOF) with regard to the average length of time an entry or record is maintained.

If this information is not available in succinct format, we request the opportunity to view the records in your offices. We agree to pay search, duplication, and review fees up to $100.00. If the fees amount to more than $100.00, we request a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) and (a)(4)(A)(iii), as the information is not sought for commercial uses and its disclosure is in the public interest, because it is likely to contribute significantly to public understanding of the operations and activities of the government and is not primarily in the commercial interest of the requester. If the request is denied in whole or in part, please justify all deletions by reference to the specific exemptions of the Act. In addition, please release all segregable portions of otherwise exempt material. We reserve the right to appeal your decision to withhold any information or to deny a waiver of fees.

Pursuant to 5 U.S.C. § 552(a)(6)(A)(i), we expect a response within the twenty (20) day statutory time limit. If you have any questions in processing this request, we can be contacted by mail at the address above or by telephone at (203) 436-4780. Thank you for your assistance in this matter.

Sincerely,

Michael J. Wishnie, Supervising Attorney
Zac Hudson, Law Student Intern
National Litigation Project of the
Lowenstein International Human Rights Clinic
The Yale Law School
127 Wall St.
New Haven, CT 06520

Lee Gelernt, Deputy Director
ACLU Immigrants' Rights Project
125 Broad Street
New York, NY 10004

Sarah Dunne, Legal Director
ACLU of Washington Foundation
705 Second Ave, Suite 300
Seattle, WA 98104

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

AMERICAN CIVIL LIBERTIES UNION  )
OF WASHINGTON,                  )
                                )
    Plaintiff,                  )
                                )
            v.                      )    Civil Action No. C09-0642 RSL
                                )
U.S. DEPARTMENT OF JUSTICE,     )
                                )
    Defendant.                  )
_____)

# EXHIBIT B



**U.S. Department of Justice**

**Federal Bureau of Investigation**

*Washington, D.C. 20535*

January 6, 2009

MR. MICHAEL J. WISHNIE
THE YALE LAW SCHOOL
127 WALL STREET
NEW HAVEN, CT 06520

Request No.:  1124788- 000
Subject: NCIC MANUAL DEC 1999
AND UPDATES

Dear Mr. Wishnie:

☒     This acknowledges receipt of your Freedom of Information-Privacy Acts (FOIPA) request to the FBI. The FOIPA number listed above has been assigned to your request.

☐     For an accurate search of our records, please provide the complete name, alias, date and place of birth for the subject of your request. Any other specific data you could provide such as prior addresses, or employment information would also be helpful. If your subject is deceased, please include date and proof of death.

☐     To make sure information about you is not released to someone else, we require your notarized signature or, in place of a notarized signature, a declaration pursuant to Title 28, United States Code 1746. For your convenience, the reverse side of this letter contains a form which may be used for this purpose.

☐     If you want the FBI's Criminal Justice Information System (CJIS) to perform a search for your arrest record, please follow the enclosed instructions in Attorney General Order 556-73. You must submit fingerprint impressions so a comparison can be made with the records kept by CJIS. This is to make sure your information is not released to an unauthorized person.

☒     We are searching the indices to our central records system at FBI Headquarters for the information you requested, and will inform you of the results as soon as possible.

☐     Processing delays have been caused by the large number of requests received by the FOIPA. We will process your request(s) as soon as possible.

Your request has been assigned the number indicated above. Please use this number in all correspondence with us. Your patience is appreciated.

Sincerely yours,

David M. Hardy
Section Chief,
Record/Information
  Dissemination Section
Records Management Division

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

AMERICAN CIVIL LIBERTIES UNION )
OF WASHINGTON, )
                                     )
        Plaintiff, )
                                     )
v.                                   )        Civil Action No. C09-0642 RSL
                                     )
U.S. DEPARTMENT OF JUSTICE, )
                                     )
        Defendant. )
                                     )

# EXHIBIT C



**U.S. Department of Justice**

**Federal Bureau of Investigation**

*Washington, D.C. 20535*

January 9, 2009

MR. MICHAEL J. WISHNIE
THE YALE LAW SCHOOL
127 WALL STREET
NEW HAVEN, CT 06520

Request No.: 1124788- 000
Subject: NCIC MANUAL DEC 1999 AND
UPDATES

Dear Mr. Wishnie:

This is in reference to your Freedom of Information-Privacy Acts (FOIPA) request.

We have located approximately 2180 pages which are potentially responsive to your request. Pursuant to Title 28, Code of Federal Regulations (CFR), Sections 16.11 and 16.49, there is a duplication fee of ten cents per page. The first 100 pages will be provided to you free of charge. Regulations require us to notify requesters when anticipated charges exceed $25, and if all of the pages are released, you will owe $208.00 in duplication fees. Please remember this is only an estimate, and if some of the pages are withheld or are not identifiable with your subject, the actual charges could be less.

You may want to consider reducing the scope of your request. This would allow you to lower your costs and hasten the receipt of your information. To streamline our operation, we divide our requests into three tracks based on the amount of material to be processed: small (1-500 pages); medium (501-2500 pages) and large (2501 or more pages), with the small track having the fastest rate of processing. To accelerate the processing of your request, you must reduce the pages to be processed to 500 pages or less. Please let us know in writing if you are interested in discussing the possibility of reducing the scope of your request or if you are willing to pay the estimated duplication cost indicated in the above paragraph. Your written response should provide a telephone number where you can be reached between the hours of 8:00 a.m. and 5:00 p.m., EST. You may also fax your response to the following number:  540-868-4996, Attention:  Work Processing Unit.  You must include the FOIPA request number in any communication regarding this matter.

Your request for a fee waiver if costs are to exceed $100 is noted but will be handled at a later date.

As stated previously, the cost indicated is only an estimate, therefore, no payment should be made at this time.

Sincerely yours,

David M. Hardy
Section Chief,
Record/Information
   Dissemination Section
Records Management Division

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

AMERICAN CIVIL LIBERTIES UNION )
OF WASHINGTON, )
)
Plaintiff, )
)
v. )        Civil Action No. C09-0642 RSL
)
U.S. DEPARTMENT OF JUSTICE, )
)
Defendant. )

# EXHIBIT D



**U.S. Department of Justice**

**Federal Bureau of Investigation**

*Washington, D.C. 20535*

*November 17, 2009*

**VIA FAX AND FIRST CLASS MAIL**
**Fax: (203) 432-9128**

Mr. Michael J. Wishnie, Supervising Attorney
Zac Hudson, Law Student Intern
National Litigation Project of the Lowenstein International Human Rights Clinic
The Yale Law School
127 Wall St.
New Haven, CT  06520

Mr. Lee Gelernt, Deputy Director
ACLU Immigrants' Rights Project
125 Broad Street
New York, NY  10004

Ms. Sarah Dunne, Legal Director
ACLU of Washington Foundation
705 Second Ave., Suite 300
Seattle, WA  98104

     RE:     <u>FOIPA Request No. 1124788</u>

Dear Mr. Wishnie, Mr. Gelernt, and Ms. Dunne:

     We are writing to you in connection with your December 19, 2008 Freedom of Information Act ("FOIA") request through which you sought "copies of any records held by the U.S. Federal Bureau of Investigation describing the operation and maintenance of the National Crime Information Center ('NCIC') Violent Gang and Terrorist Organization File ('VGTOF')."

     One aspect of your December 19, 2008 letter which the FBI has not yet addressed is a request for limitation of processing fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) and a request for waiver of all costs pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) if the fees amount to more than $100. Please bear in mind that the FBI provides the first 100 pages free and then charges 10 cents per duplication.

     <u>Limitation of Processing Fees</u>

     ACLU has requested a limitation of processing fees based on 5 U.S.C. § 552(a)(4)(A)(ii)(II) ("fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by . . . a representative of the news media . . . "). In this case, although FBI personnel have expended time to conduct a search for responsive documents -- which is still continuing -- and will in the future conduct a page-by-page, line-by-line review, the FBI has not maintained an aggregate total of hours spent on these tasks. As a result, the FBI does not plan to charge search or processing fees in conjunction with your request, and therefore, the question of whether the ACLU is a representative of the news media for processing fee purposes need not be decided in this instance.

     <u>Waiver of all Costs</u>

     The ACLU has requested a waiver of all costs pursuant to 5 U.S.C. § 552(a)(4)(A)(iii), which states that "[d]ocuments shall be furnished without any charge if disclosure of the [requested] information is in the public interest because it is likely to contribute significantly to the public understanding of the operations and activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).  In its request letter the ACLU states that "the information is not sought for commercial uses and its disclosure is in the public interest, because it is likely to contribute significantly to public understanding of the operations and activities of the government and is not primarily in the commercial

Mr. Wishnie, Mr. Gelernt, and Ms. Dunne
November 17, 2009
Page 2

interest of the requester."   Aside from repeating the criteria set forth at § 552(a)(4)(A)(iii), the request letter provides no specific details to support a fee waiver request.

At the outset it should be emphasized that the language of the statute provides that fee waivers are determined on a case-by-case basis.  See 5 U.S.C. § 552 (a)(4)(A)(iii);  See also Nat'l Sec. Archive v. DOD, 880 F.2d 1381, 1383 (D.C. Cir. 1989)(observing that fee waiver decisions are to be made on "case-by-case" basis).  As you know, the burden is on the requester to show that the statutory requirements for a fee waiver have been met.

In determining whether ACLU has met this burden, and therefore is entitled to a fee waiver, I must consider the following six factors:  (1) whether the subject of the requested records concerns "the operations or activities of the government"; (2) whether the disclosure is "likely to contribute" to an understanding of governmental operations or activities; (3) whether disclosure of the requested information will contribute to the understanding of the general public; (4) whether the disclosure is likely to contribute "significantly" to public understanding of government operations or activities; (5) whether the requester has a commercial interest that would be furthered by the requested disclosure; and (6) whether any such commercial interest outweighs the public interest in disclosure.  See 28 C.F.R. § 16.11(k) (2004).  On the basis of all of the information available to me, I have concluded that your request for a fee waiver should be denied.  In reaching my conclusion, I have analyzed the above six factors as they apply to the circumstances of your request.  While some of the information that the ACLU has sought reflects certain operations and activities of the government and you appear to have no overriding commercial interest in the material, other factors have not been satisfied.  Again, you have provided no specific details to support a fee waiver request.

It appears that several of the documents identified to date as potentially responsive to this request relate to documents previously disclosed through other FOIA requests.  In the complaint, you specifically note that portions of responsive documents had been previously released to the public.  While this information may be of interest to the public and to the ACLU, records are not deemed to be in the FOIA public interest unless the released records will significantly enlighten the public about the operations of the government.  A re-release of information already in the public domain adds nothing new to the universe of information already available to the public and, therefore, cannot be said to be "likely to contribute" to an understanding of operations or activities of the federal government.  Consequently, Factor 2 has not been met.

Moreover, some of the documents identified to date as potentially responsive to this request consist of internal administrative data and other non-substantive information, as well as the type of materials described in the paragraph above.  These documents do not meet the statutory standard under Factor 4 as they will not "significantly" contribute to the public's understanding of government operations or activities of the FBI.

In conclusion, I have decided to deny ACLU's request for a fee waiver in connection with this request, because the release of this information has not and will not contribute significantly to the public understanding of the FBI's law enforcement mission.

In light of this decision, please notify the FBI in writing within sixty (60) days from the date of this letter as to ACLU's willingness to pay duplication fees which, as of this date, are estimated to be at least $208.00.  Please do not submit any payment at this time as this is just an estimate as the FBI continues its search efforts.  In the event that it locates additional responsive material, we will notify you of additional duplication fees which will accrue in the future.

Sincerely yours,

David M. Hardy
Section Chief
Record/Information
Dissemination Section
Records Management Division